F:\GP\2840.017 - SRZ - Meketa\Pleadings\2840.017.complaint.fnl.docx

DANIELS, FINE, ISRAEL,
SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807
Paul R. Fine, State Bar No. 053514
*fine@dfis-law.com*
Geronimo Perez, State Bar No. 223657
*gperez@dfis-law.com*

OF COUNSEL:
SCHULTE ROTH & ZABEL LLP
919 THIRD AVENUE
NEW YORK, NY 10022
TELEPHONE: 212.756.2000
Ronald E. Richman (*PHV forthcoming*)
*ronald.richman@srz.com*
William H. Gussman, Jr (*PHV forthcoming*)
*bill.gussman@srz.com*
Steven R. Fisher (*PHV forthcoming*)
*steven.fisher@srz.com*
Andrew B. Lowy (*PHV forthcoming*)
*steven.fisher@srz.com*

Attorneys for Plaintiffs
CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN
CALIFORNIA and the BOARD OF TRUSTEES FOR THE CONSTRUCTION
LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA, each on
behalf of the Construction Laborers Pension Plan for Southern California

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA and the BOARD OF TRUSTEES FOR THE CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA, each on behalf of the Construction Laborers Pension Plan for Southern California, | Case No. |
| | COMPLAINT |
| Plaintiffs, | |
| vs. | |

1

MEKETA INVESTMENT GROUP, INC.
and JUDY CHAMBERS,

            Defendants.

       Plaintiffs CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA (the "Pension Fund") and the BOARD OF TRUSTEES OF THE CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA (the "Board"), each on behalf of the Construction Laborers Pension Plan for Southern California (the "Plan"), by and through its undersigned counsel, for their Complaint against Defendants MEKETA INVESTMENT GROUP, INC. ("Meketa") and JUDY CHAMBERS ("Chambers" and, together with Meketa, "Defendants") hereby allege on the basis of knowledge with respect to themselves and their actions and on the basis of knowledge and information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

      1.    This action seeks to remedy serious wrongdoing by Defendants—fiduciaries to the Pension Fund and the pension plan it administers, the Construction Laborers Pension Plan for Southern California (the "Plan"), under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Rather than discharge their duties with the required prudence and care mandated by ERISA, Defendants failed to provide appropriate advice to the Pension Fund, advising the Pension Fund to enter into an inappropriate infrastructure investment. Compounding the problem, Defendants then abandoned their obligations to oversee the investment as the infrastructure investment program collapsed under the weight of inexperience and fraud on the part of the managers Defendants had recklessly recommended to the Pension Fund.

///

///

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

2.      In November 2014, the Pension Fund formally retained Pension Consulting Alliance, Inc. ("PCA")[1] to provide investment consulting services related to a potential Pension Fund investment in an infrastructure fund in which the Pension Fund would be the sole investor.  In the parties' written retainer agreement, PCA agreed to provide its services to the Pension Fund as an ERISA fiduciary—a key part of PCA's pitch to the Pension Fund.  In providing its services to the Pension Fund, PCA was an ERISA fiduciary as a result of exercising discretion concerning the investment of the Plan's assets.

3.      Ultimately, that infrastructure fund was established and named the California Infrastructure Fund I, LP (the "Infrastructure Fund").  The Pension Fund engaged PCA to, among other things, (i) develop an Infrastructure Investment Policy; (ii) identify, vet, and recommend potential managers for the Infrastructure Fund who would implement the Infrastructure Investment Policy on its behalf and on behalf of the Plan; (iii) provide access to other capital to diversify project risks; (iv) attend meetings with the Board to explain the Infrastructure Fund's investments; and (v) provide research and educational materials to the Board.

4.      Defendants also agreed to monitor and review the Infrastructure Fund's portfolio performance and its managers on behalf of the Pension Fund and the Plan. Defendants—whose business focuses on advising multiemployer pension plans— expressly committed to, and did, act as a fiduciary under ERISA.  PCA understood that the Board was relying on PCA's investment expertise and experience. Unfortunately for the Pension Fund and the Plan's participants and beneficiaries, Defendants neglected their duties and caused the Pension Fund to incur massive losses.

5.      Despite their contractual and fiduciary obligations to the contrary,

---

[1] Pension Consulting Alliance, Inc. merged with Meketa in or around January 2019 and, upon information and belief, Meketa acquired all of PCA's stock, assets, and liabilities, including its contract with the Pension Fund.  For purposes of this Complaint, PCA and Defendant Meketa shall be used interchangeably, unless otherwise noted.

Defendants failed to adequately vet managers. Instead, without any appropriate diligence, Defendants recommended Onset General Partner, LLC ("Onset"), a newly formed company consisting of three principals introduced to each other by Chambers. Onset's three principals had never worked together before.

6. Upon Defendants' recommendation, the Pension Fund, through a special purpose limited partner entity, committed to invest $30 million of Plan assets in the Infrastructure Fund to be managed by Onset.

7. Unfortunately, and as Defendants knew or should have known, Onset made a series of ill-advised investment decisions, putting the Pension Fund's capital in nine early stage infrastructure start-up companies (the "Portfolio Companies") with little or no meaningful diligence. As time went on, rather than accept its failures, Onset materially misrepresented the valuation and performance of the investments it had made for the Infrastructure Fund. By 2021, Onset represented to the Pension Fund that the Infrastructure Fund had a value of almost $55 million when, in truth, the portfolio's value—as ultimately determined by an independent third-party after Onset's fraud was discovered—was only about $12.275 million.

8. Rather than diligently reviewing and monitoring Onset's management of the Infrastructure Fund as they had a fiduciary obligation to do, Defendants periodically reported to the Pension Fund on the Infrastructure Fund's "progress," relying on Onset's fraudulent valuations and falsely lending additional credence to those valuations. Defendants were asleep at the wheel, accepting, without appropriate inquiry, the false investment reports issued by Onset. Throughout this time, Defendants knew that the Pension Fund was relying on their oversight and guidance to safeguard Plan assets and the hard-earned retirement money of the Plan's participants and beneficiaries.

9. The Infrastructure Fund's performance was so abysmal that, by 2021, seven of the nine Portfolio Companies had no revenues and five of the nine had little to no cash on hand. Consequently, many of the Portfolio Companies required

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

additional large cash infusions or would face the prospect of shutting down entirely. Desperate to avoid a collapse that would expose their fraud, Onset approached the Pension Fund with requests for significant additional money to support the failing Portfolio Companies.  Far from raising the alarm, Defendants recommended complying with certain of these requests.  Unfortunately, by this time, the operating performance of the Portfolio Companies had deteriorated to the point where they were permanently damaged.

10.    The incongruity between the reported performance of the portfolio—supported by Defendants' "reviews"—and Onset's push for more cash triggered alarm bells at the Pension Fund.  As a result, the Pension Fund hired additional third-party advisors to conduct a review of the Infrastructure Fund's investments—a review that should have been conducted, or at least suggested, by Defendants who had a fiduciary obligation to review Onset's management of the portfolio.  An independent third-party valuation would rapidly conclude that at least three of the nine Portfolio Companies were worthless—something that Defendants (professional investment advisors who had represented to the Pension Fund that it had experience establishing $10 billion of infrastructure portfolios for pension plans) knew or should have known.

11.    In investing in the Infrastructure Fund, the Pension Fund was relying on both Defendants' purported expertise in the field of infrastructure investment and Defendants' fiduciary obligations to the Pension Fund and the Plan.

12.    Were it not for Defendants' wrongful behavior and manifest breaches of contractual and fiduciary duties in vetting prospective managers, Onset would never have been in a position to manage the Infrastructure Fund.  Defendants failed to act prudently in recommending Onset as manager and, as a result, the Pension Fund suffered large losses.

13.    Moreover, had Defendants adequately monitored and reviewed the performance of the Infrastructure Fund, instead of imprudently turning a blind eye in violation of their fiduciary duties, the Pension Fund would have discovered Onset's

5

fraud and mismanagement years sooner, saving millions of dollars of hard-earned retirement savings of Southern California's construction workers.

14.     The Pension Fund now brings this action to enforce Defendants' liability under ERISA, which requires breaching fiduciaries to make the Pension Fund and the Plan whole from losses resulting from their fiduciary breaches, as well as other common law claims.  Pursuant to ERISA Section 409, 29 U.S.C. § 1109(a), Chambers is personally liable as a fiduciary, including because she undertook her duties with respect to the Pension Fund and the Plan as a fiduciary under ERISA.

## THE PARTIES

15.     Plaintiff Pension Fund is a Taft-Hartley pension fund administered by the Board, with an equal number of trustees selected by employers that contribute to the Pension Fund and the Southern California District Council of Laborers for and on behalf of the District Council and its affiliated Local Unions of the Laborers' International Union of North America, A.F.L.-C.I.O.    The Pension Fund was established and is maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5).

16.     The Board, sponsors and administers the Plan, a multiemployer plan within the meaning of Section 3(37) of ERISA.

17.     Defendant Meketa is a Massachusetts corporation with a principal place of business in Westwood, Massachusetts.  Meketa is registered with the California Secretary of State to conduct business in California and has been since 2002.

18.     Defendant Chambers is a Managing Principal and Private Markets Consultant at Meketa.  At all relevant times Chambers was employed by Meketa or its predecessor firm, PCA.  At times relevant herein, Chambers was listed as a Secretary of PCA when PCA was registered to do business in California with the California Secretary of State.  Upon information and belief, Chambers resides in New York.

////

COMPLAINT

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

## **JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction in this ERISA matter pursuant to 28 U.S.C. § 1331 and ERISA Section 502, which provides for federal jurisdiction over issues under Title I of ERISA.

20.     This Court may exercise subject matter jurisdiction over all other claims in this Complaint pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Defendants because they transacted business in this District and have significant contacts with this District.

22.     Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because the Pension Fund is administered in this District and some or all of the violations of ERISA occurred in this District.

## **FACTS**

### **Defendants Are Retained as Consultants by the Pension Fund**

23.     In mid-2014, the Pension Fund decided to diversify its investments by investing in various infrastructure-building projects to be located in the State of California.

24.     In a presentation dated September 9, 2014, PCA, led by Chambers, pitched itself as an investment consultant to guide the Pension Fund's infrastructure investment project.   Chambers traveled to El Monte, California to make this presentation to the Board in person.

25.     PCA and Chambers represented to the Pension Fund that, if selected as a consultant, they would serve as a fiduciary, aid in developing an infrastructure investment policy, and identify and vet prospective investment managers.

26.     Following this presentation, the Pension Fund and PCA entered into a letter agreement dated November 14, 2014 to memorialize the terms of engagement (the "Consulting Agreement").   A true and accurate copy of the Consulting Agreement is attached as **Exhibit A**.  Chambers was the signatory on behalf of PCA.

27.     Under the Consulting Agreement, PCA agreed to provide the Pension

7

Fund with a broad range of investment consulting services with respect to the planned infrastructure investment.  The Consulting Agreement expressly provided that PCA "would contract as a fiduciary on behalf of the [Pension Fund]."  PCA agreed to exercise, and ultimately did exercise, discretion concerning the investment of the Plan's assets.

28.   Among other things, the Consulting Agreement obligated PCA to perform services relating to Infrastructure Investment Program Development and Program Manager Search and Due Diligence.

29.   With respect to Infrastructure Investment Program Development, PCA was required to: (i) "assist in developing a unique investment platform that captures objectives of the [Pension Fund]"; (ii) "review/develop investment strategy, policies, procedures, goals and objectives"; (iii) "oversee the Program Manager's strategy, investment selection process, deal pipeline and investment process"; (iv) "implement responsible contracting policies and procedures"; (v) "assess risk profiles of various sub-asset types"; (vi) "propose benchmark and risk measures"; (vii) "assist with portfolio target allocation and ranges"; (viii) "advise on investment structuring and commitment pacing"; and (ix) "advise on portfolio construction."

30.   With respect to its Program Manager Search and Due Diligence obligations, PCA obligated itself to: (i) "identify, interview and conduct due diligence on potential Program Manager(s) who will have investment discretion"; (ii) "negotiate terms with the Program Manager on behalf of the [Pension Fund]"; and (iii) "provide client with periodic updates on potential investment opportunities as they arise."

**Defendants Prepare the Infrastructure Investment Policy**

31.   Following the execution of the Consulting Agreement, PCA and Chambers developed the Infrastructure Investment Policy for the Pension Fund.  The Infrastructure Investment Policy was implemented to "ensure[] that investors, managers, consultants, or other participants selected by the [Pension Fund] take

8

prudent and careful action while managing the Portfolio."  It also made clear that PCA, as the "General Consultant," would bear responsibility to review the Portfolio and report directly to the Board.  A true and accurate copy of the Infrastructure Investment Policy is attached as **Exhibit B**.

32.    On December 9, 2014, Chambers—again traveling to El Monte, California—presented the Infrastructure Investment Policy to the Board.  At the recommendation of Chambers, the Board voted to adopt the Infrastructure Investment Policy at this meeting.

33.    The Infrastructure Investment Policy outlined four investment objectives that were to guide the Infrastructure Fund's manager in making investments.  These objectives were: (A) "To provide improved diversification to the overall [Pension Fund's] Investment Portfolio;" (B) "To generate an enhanced yield to the actuarial earning rate assumption and provide stable cash flows;" (C) "To preserve investment capital;" and (D) "To act as a responsible steward of infrastructure investments through responsible contracting and environmental practices, efficient operation of assets, and production of quality services and products."

34.    The Infrastructure Investment Policy also contained a section entitled "Infrastructure Sectors and Characteristics" with a subsection entitled "Allocation," which outlined how the Infrastructure Fund's manager was obligated to allocate invested funds.  Specifically, the "Allocation" subsection provided that "funds will be allocated to infrastructure projects located in California that will achieve the objectives of the Infrastructure Portfolio as previously outlined."

35.    Additionally, among other things, the Infrastructure Fund's manager was obligated to "make short term investments with a term from one to five years" and that, even considering market volatility, "best efforts will be made to keep segments within the recommended ranges given the short term investment preference."

36.    The Infrastructure Investment Policy also contained a section of "Investment Policy Guidelines."  A subsection entitled "Investment Life Cycle"

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

9

indicated that to combat risk, the Infrastructure Fund manager should ensure the portfolio was "appropriately diversified according to life cycle" with the stages of an investment's life cycle including "predevelopment, development, leasing, operating, and redevelopment."  In other words, the Infrastructure Fund's manager was not supposed to select only early or late-stage investments, but a blend.

37.    The "Investment Policy Guidelines" section also provided that "[i]nvestments in infrastructure assets should have clearly articulated and viable exit strategies through which assets can be disposed of or liquidated."  This is because "the goal of the program is to invest in short term infrastructure opportunities within a tenure of one to five years that have a clear liquidity mechanism."

38.    The Infrastructure Investment Policy was not limited to setting forth the obligations of the prospective Infrastructure Fund's management.  The "General Consultant"—PCA and, later, Meketa—was obligated to "monitor the investment process for compliance with this policy."

39.    The Infrastructure Investment Policy then described PCA's monitoring obligations.  Specifically, the manager's "selection of infrastructure investments shall be guided by the 'prudent expert' standard, embracing the prudent decision-making process typically employed by experts in the areas of infrastructure acquisition, development, operation, disposition, and portfolio management."  PCA, as General Consultant, was required to ensure compliance with this standard.

40.    To further guide the review of any Infrastructure Fund manager, the Infrastructure Investment Policy provided that:

> prospective Investment Managers shall be evaluated for selection based on criteria including, but not limited to: (i) the suitability of the organization's investment, relative to the Plan's investment guidelines and objectives; (ii) the quality, stability, integrity, and experience of the management team; (iii) the ability and willingness of the

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

organization to dedicate sufficient resources and personnel to optimally manage the Plan's investments; (iv) the reasonableness of investment terms and conditions, including provisions to align interests of management and the Plan; (v) the appropriateness of management controls and reporting systems; and (vi) commitment to responsible contracting policies, workplace diversity, and community involvement.

41. The Infrastructure Investment Policy also provided that "investment managers shall be monitored and evaluated continuously, based on their performance relative to stated objectives and benchmarks, and relative to the performance of firms managing similar investments in the marketplace" and that "investment managers shall be monitored for compliance with investment guidelines, policies, and procedures of the Infrastructure Portfolio, and other contractual provisions." Here again, PCA, as General Consultant, was required to ensure compliance with this standard.

**Defendants Fail to Vet Managers or Advise the Pension Fund on the Size of Investment**

42. On March 10, 2015, PCA and Chambers, again attending the meeting in El Monte, California in person, presented the Pension Fund with their preliminary assessment of potential investment managers to implement the Infrastructure Investment Policy and manage the Infrastructure Fund. Chambers was PCA's lead presenter at the meeting.

43. Chambers and PCA stated that they reviewed eight potential managers, including Onset Capital Partners, a corporate relative of the eventual manager, Onset. Despite lacking experience and resources, Onset Capital Partners was the only manager Chambers and PCA recommended the Pension Fund's Board meet.

44. Chambers, in fact, had a direct role in Onset's creation. Chambers was

11

the person who introduced Onset's three principals for the exclusive and express purpose of managing the Pension Fund's investment.

45.    Despite this, Onset was the only potential manager Chambers and PCA recommended for a face-to-face meeting with the Pension Fund's Board.

46.    In the very same March 10, 2015 presentation to the Pension Fund in which Chambers reviewed eight prospective investment managers, Chambers specifically recommended the Board meet only with Onset.   In justifying this recommendation, Defendants claimed that the "Onset team has demonstrated experience in identifying, financing and executing transactions in numerous sectors," that Onset was an "[e]xperienced investment manager," that Onset had shown a "[w]illingness to focus on an economically targeted investment program," and that Onset provided a "[n]etwork of resources for deal sourcing."

47.    Demonstrating that Onset's status as manager was effectively already decided, Chambers and PCA's March 10, 2015 presentation referred to Onset as "the manager" and that they would like to present "the manager" at the Pension Fund's April meeting and requested permission from the Pension Fund to begin negotiating a contract with Onset.

48.    At no time did Chambers or PCA advise the Pension Fund that an initial investment of only $30 million in a "fund of one" was inadequate to accomplish the Pension Fund's goals of realizing a return on infrastructure investment in only approximately five years.   Nevertheless, in violation of their fiduciary duties, Chambers and PCA continued to advise moving forward with the project.

49.    Based on Chambers' and PCA's recommendation and urging, the Pension Fund chose Onset to manage the infrastructure investment and created a limited partner entity to invest $30 million in the Infrastructure Fund, as the sole investor.  Onset officially became the general partner in January of 2016.

**Onset Fails as Manager While Defendants Sit Idly By**

50.    Once Onset was installed as general partner of the Infrastructure Fund,

it signed up for infrastructure investments without proper diligence and notwithstanding the Portfolio Companies' incompatibility with the Infrastructure Investment Policy.  Between March of 2016 and October of 2018, Onset invested the Pension Fund's $30 million investment in nine Portfolio Companies.

51.   The Portfolio Companies were incompatible with the Infrastructure Investment Policy from the outset, something Chambers and PCA knew or should have known.  All of the investments were in very early stage companies, akin to venture capital investments.  As such, and contrary to the mandate in the Infrastructure Investment Policy, the portfolio was not at all diversified with respect to the life cycle of infrastructure investments and was inconsistent with the five year time period that governed the Infrastructure Fund.

52.   Chambers and PCA—responsible for monitoring Onset's actions as investment manager—never alerted the Pension Fund that Onset was investing the Infrastructure Fund's money in a manner that violated the Infrastructure Investment Policy and would doom the Infrastructure Fund to failure.  Chambers and PCA—professional investment consultants with vast experience in infrastructure investing—were in the best position to, and had a fiduciary obligation to, review Onset's portfolio construction and alert the Pension Fund to Onset's wrongful actions.  They did not do so.

53.   Instead, Chambers and PCA did the opposite, in at least one case, specifically endorsing an investment in one Portfolio Company, Repower Capital, in a March 8, 2016 letter.  Chambers and PCA did so despite stating that Repower Capital's "growth estimates are aggressive and may take longer to materialize."  In other words, despite knowing that the investment fell outside the parameters of the Infrastructure Investment Policy, Chambers and PCA endorsed it, and noted that the "investment appears to be reasonable."

54.   Onset also failed to adequately manage the investments that it made.  Onset's principals did not spend the necessary time working with the Portfolio

Companies to assist with their development, as they were contractually obligated to do. Had Chambers and PCA properly monitored Onset, they would have prevented, or at least limited, the Pension Fund's losses.

55.    Onset's inappropriate selection and poor or no management of the Portfolio Companies rendered failure likely, as Chambers and PCA plainly knew but took no steps to correct or to warn the Pension Fund. The Portfolio Companies struggled from the very beginning. Onset, with no meaningful oversight from Chambers and PCA, hid the true—declining—value of the Portfolio Companies from the Pension Fund. It did so by placing values on the Infrastructure Fund's investments that did not bear any semblance to true market values and covered up the fact that the Infrastructure Fund's investments were dropping in value. Indeed, while the Infrastructure Fund was declining in value, Onset repeatedly referred to (false) increases in rates of return for the portfolio in making presentations and reporting valuation and performance to the Pension Fund.

56.    Had Chambers and PCA been exercising adequate oversight over Onset, they would have known that such performance figures were inaccurate.

57.    For example, in 2017 Onset claimed the value of the Infrastructure Fund's assets to be almost $14 million, far above their true market value. This pattern continued in subsequent years. Onset claimed that the value of the Infrastructure Fund's assets was approximately $32.2 million as of December 31, 2018. Onset stated that the value of the Infrastructure Fund's assets was approximately $44.6 million as of December 31, 2019. Onset alleged that the Infrastructure Fund's asset value was approximately $54.9 million as of December 31, 2020.

58.    The valuation metrics Onset used were fundamentally flawed and deviated from industry standards. As a result, all of the asset values were dramatically and intentionally overstated to paint a picture that there was growing value in the Infrastructure Fund when, in fact, the investments were struggling and rapidly losing value. Defendants never questioned Onset's valuations, underscoring the lack of

oversight.

59.    As subsequently determined by an independent valuation firm, the market value of the Portfolio Companies was dramatically less than Onset represented, which Defendants allowed to go unchallenged.    The independent valuation firm, Impact Capital Group, concluded that the valuation of the Portfolio Companies was only $13.025 million and $12.275 million as of December 31, 2020 and December 31, 2021, respectively—down from over $30 million invested.    The December 31, 2020 valuation of just over $13 million was over $40 million less than the inflated number put forth by Onset.

60.    Onset's fraud was only possible because Defendants abandoned their fiduciary and contractual duties to review and monitor Onset's investment program. Had they behaved prudently and not wholly endorsed Onset's behavior, Onset's fraud would have been obvious.

61.    Specifically, Onset, under the nose of Defendants, was manipulating the valuation process by using speculative and baseless methods for valuing different Portfolio Companies.    A review of Onset's own valuation memoranda demonstrates an inconsistent approach to valuation and incomplete use of financial tools.    In some cases, assumptions relied on a theoretical IPO occurring, and in other cases there was no reliance on operating results to arrive at a value.    These actions reveal a conscious effort to provide a false view of the individual companies and to present to the Pension Fund ever-rising values, when in fact the portfolio was declining precipitously.

62.    With respect to several of the Portfolio Companies in which the Infrastructure Fund had debt investments, Onset simply assumed that the Portfolio Company would repay the Infrastructure Fund the principal, all accrued interest, and fees.    Onset made these assumptions even though the Portfolio Companies were in payment default on the loans.

63.    For example, Onset made such an assumption with respect to the Infrastructure Fund's investment in Oceanus Power and Water, LLC ("Oceanus").

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

Without basis, and notwithstanding that Oceanus was in default on the loan from the Infrastructure Fund, Onset assumed for purposes of its valuation that Oceanus would repay the debt in full, plus all accrued and deferred interest.

64.    Onset also engaged in restructuring transactions with some of the Portfolio Companies in which the entire amount of unpaid principal and interest on a loan in deep payment default was rolled up into a new loan.  This new loan would appear as current and not in default.  In reality, however, it constituted all the uncollected principal and overdue interest of the old loans.  By doing this, Onset gave the false impression to the Pension Fund that the loan would be fully collected.

65.    For example, Onset employed this inappropriate valuation and accounting approach in valuing the Infrastructure Fund's loan to Phelan Park 1, LLC ("Phelan"), a Portfolio Company with a plan to convert biological fuel into electricity. Onset initially caused the Infrastructure Fund to loan $500,000 to Phelan.  Phelan defaulted on this loan in December 2020.  Despite that, Onset loaned additional sums on at least two other occasions in 2021, each time, rolling over the defaulted amount into a new loan and treating the new loan as a good loan and fully collectible.  This allowed Onset to claim an increase in the value of the Infrastructure Fund while, in actuality, no such gains existed.

66.    Onset ultimately invested almost $4.1 million of the Pension Fund's money into the Phelan investment in this way.  In 2020 Onset valued the total investment in Phelan at just under $4 million (approximately $3.5 million in debt and $450,000 in equity).  An independent valuation firm has concluded that the Phelan investment was worth zero by December 31, 2020.

67.    Defendants provided no meaningful oversight and never alerted the Pension Fund to any issues with respect to Onset's egregious valuation tactics. Indeed, far from exercising oversight over these flawed valuations, Defendants repeated them in a series of "Portfolio Reviews" they supplied to the Pension Fund, accepting Onset's baseless valuations without inquiry and neglecting their fiduciary

duties.

**The Pension Fund Discovers the Onset Fraud and Defendants' Oversight Failures**

68.     By a letter dated January 25, 2019, Chambers notified the Pension Fund of the merger between PCA and Meketa, and the Pension Fund consented to the assignment of the Consulting Agreement to Meketa.  Upon information and belief, Meketa assumed all of PCA's liabilities as a result of the merger.

69.     In August 2019, the Pension Fund changed investment advisers from Merrill Lynch to NEPC, LLC ("NEPC").  By April 2020, the Pension Fund was considering consolidating advisers and replacing Meketa with NEPC to oversee Onset.

70.     In or around that time, in the Spring of 2020, Meketa requested an additional $1 million from the Pension Fund for Onset to invest one of the Portfolio Companies, GeoGenco.  NEPC, now serving as the investment adviser for the Pension Fund, vetted the investment.  NEPC concluded that while it could not opine on the additional investment's prospects, it was certain that there would never be a return on GeoGenco absent the additional capital. NEPC also stated that it was unable to find support for the valuation of GeoGenco that Meketa and Onset were claiming.

71.     Shortly thereafter, in August of 2020, Chambers was notified by email of the Pension Fund's intent to terminate Meketa's services, effective September 30, 2020.

72.     By May 2021, a number of the Infrastructure Fund's Portfolio Companies desperately needed more cash to continue to operate at all.  Onset—rather than risk a collapse of the Portfolio Companies that would cause its fraud to be too difficult to conceal—approached the Pension Fund to request significant, additional capital infusions into the Infrastructure Fund.  In the same report where Onset reported an Infrastructure Fund value of $54.9 million to the Pension Fund, it requested an additional $11 million in funding for certain Portfolio Companies.

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

73.    There was a tension, however, in the portrait being painted of the Infrastructure Fund by Onset and the request for so much new funding being made to the Pension Fund.

74.    The Pension Fund hired additional professional advisors to independently review the financial condition of the Infrastructure Fund—what Defendants should have been doing—ultimately leading the Pension Fund to replace Onset as general partner.

75.    An independent valuation of the portfolio concluded that, as of December 31, 2020, the Portfolio Companies had a combined valuation of only $13,025,000 (compared to approximately $30.5 million of called capital invested and a purported $48.5 million valuation being touted by Onset).  Three of the Portfolio Companies were worth zero; one was worth less than 10% of the original amount invested; three others had declined by more than 50%; and all nine Portfolio Companies had declined in value.

## **FIRST CAUSE OF ACTION**

### **Breach of Fiduciary Duty Under ERISA Against All Defendants**

76.    The Pension Fund repeats and incorporates by reference the allegations contain in Paragraphs 1 through 75 of this Complaint.

77.    Defendants agreed to exercise, and did exercise, discretion concerning the investment of the Plan's assets.

78.    Defendants are fiduciaries of the Pension Fund and the Plan under ERISA within the meaning of ERISA Section 404.

79.    ERISA Section 404 imposes fiduciary duties of prudence upon Defendants in their work on behalf of the Pension Fund and the Plan.

80.    ERISA Section 404 further imposes fiduciary duties to follow relevant governing documents upon Defendants in their work on behalf of the Pension Fund and Plan.

81.    Specifically, Defendants had a fiduciary duty to adequately: (1) identify,

interview, and conduct due diligence on Onset or any other prospective managers for the Infrastructure Fund; (2) supervise and provide oversight over Onset as manager of the Infrastructure Fund; and (3) ensure that Onset complied with the Infrastructure Investment Policy.

82.     Defendants breached these duties by failing to employ a prudent process to: (1) identify, interview, and conduct due diligence on prospective Infrastructure Fund managers; (2) supervise and provide meaningful oversight over the Infrastructure Fund manager; and (3) ensure the Infrastructure Investment Policy was complied with.

83.     Defendants further breached their fiduciary duties by violating the terms of the Infrastructure Investment Policy which, following adoption by the Board, is a plan document within the meaning of ERISA Section 404(a)(1)(D).

84.     Defendants' failure to discharge their duties with respect to the Pension Fund and the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breached their duties under ERISA Section 404.

85.     As a result of Defendants' breaches of fiduciary duty of prudence the Pension Fund and the Plan suffered objectively unreasonable and unnecessary monetary losses.

86.     Defendants are liable under ERISA Sections 409 and 502 to make good to the Pension Fund and the Plan losses resulting from the breaches and to restore to the Pension Fund any profits resulting from the breaches of fiduciary duties alleged in this Count.

87.     Defendants are further subject to other equitable relief pursuant to ERISA Section 409 and 502.

88.     Defendants are further liable for attorney's fees and costs under ERISA Section 502(g).

**SECOND CAUSE OF ACTION**

**Breach of Contract Against Meketa**

89.     The Pension Fund repeats and incorporates by reference the allegations contain in Paragraphs 1 through 88 of this Complaint.

90.     The Consulting Agreement is a valid and binding contract between PCA and the Pension Fund.

91.     Meketa is the successor in interest to PCA by way of its merger with PCA and has assumed PCA's liability under the Consulting Agreement.

92.     The Pension Fund performed its obligations pursuant to the Consulting Agreement.

93.     PCA breached the Consulting Agreement by failing to adequately vet potential managers, including Onset.

94.     Specifically, the Consulting Agreement obligated PCA to identify, interview, and conduct due diligence on potential managers for the Infrastructure Fund.

95.     PCA breached this obligation by, among other things, failing to adequately vet or otherwise perform due diligence on Onset as evidenced by Onset's manifest incompatibility with the requirements for a manager.

96.     PCA and Meketa further breached the Consulting Agreement by failing to adequately monitor Onset's work as general partner to the Infrastructure Fund to ensure compliance with the Infrastructure Investment Policy.

97.     Specifically, the Consulting Agreement obligated PCA and Meketa to develop and oversee the implementation of the Infrastructure Investment Policy.

98.     PCA and Meketa breached this obligation by, among other things, failing to adequately oversee Onset's strategy, investment selection proves, deal pipeline, and investment process and alert the Pension Fund that Onset was not complying with the Infrastructure Investment Policy.

99.     The Pension Fund has been damaged by Defendants' breaches in an

COMPLAINT

amount to be determined at trial.

## THIRD CAUSE OF ACTION

## Breach of Common Law Fiduciary Duty Against All Defendants

100.   The Pension Fund repeats and incorporates by reference the allegations contained in Paragraphs 1 through 99 of this Complaint.

101.   This cause of action is pled in the alternative to the First Cause of Action pursuant to Federal Rule of Civil Procedure 8(d)(2).

102.   Defendants owed certain common law fiduciary duties to the Pension Fund, including duties of loyalty and care.

103.   Indeed, pursuant to the Consulting Agreement, which Meketa assumed PCA's liability for, Defendants assumed a fiduciary duty to the Pension Fund.

104.   Defendants intentionally ignored these duties and willfully and with malice engaged in acts against the interests of the Pension Fund and for their own benefit.

105.   Defendants breached their fiduciary duties to the Pension Fund by, among other things:

       1.     Failing to properly oversee Onset's strategy, investment selection process, deal pipeline and investment process;

       2.     Failing to propose benchmark and risk measures;

       3.     Failing to assist with portfolio target allocation and ranges;

       4.     Failing to appropriately advise on investment structuring and commitment pacing;

       5.     Failing to appropriately advise on portfolio construction; and

       6.     Failing to adequately identify, interview and conduct due diligence on Onset or any other prospective managers for the Infrastructure Fund.

106.   Defendants elevated their interests above those of the Pension Fund by failing to adequately vet and monitor Onset in violation of the Infrastructure

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

21

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

1  Investment Policy's, refusing to expend any time or resources to protect the interests
2  of the Pension Fund.

3    107.  The Pension Fund has been damaged by Defendants' breaches in an
4  amount to be determined at trial.

5    108.  The Pension Fund is also entitled to punitive damages as a result of
6  Defendants' malicious conduct.

7    **FOURTH CAUSE OF ACTION**

8    **Negligence/Gross Negligence Against All Defendants**

9    109.  The Infrastructure Fund repeats and incorporates by reference the
10  allegations contained in Paragraphs 1 through 108 of this Complaint.

11    110.  This cause of action is pled in the alternative to the First Cause of Action
12  pursuant to Federal Rule of Civil Procedure 8(d)(2).

13    111.  Defendants owed the Pension Fund a duty of care to perform their work
14  in a reasonable manner.

15    112.  Defendants breached those duties by failing to exercise a reasonable duty
16  of care performing its work, including, among other ways:

17    1.  Failing to properly oversee Onset's strategy, investment selection
18       process, deal pipeline and investment process;

19    2.  Failing to propose benchmark and risk measures;

20    3.  Failing to assist with portfolio target allocation and rangers;

21    4.  Failing to appropriately advise on investment structuring and
22       commitment pacing;

23    5.  Failing to appropriately advise on portfolio construction; and

24    6.  Failing to adequately identify, interview and conduct due
25       diligence on Onset or any other prospective managers for the
26       Infrastructure Fund

27    113.  Defendants knew at the time of its actions that negligently performing
28  their oversight and monitoring tasks, where they were the only parties obligated to do

so, involved an extreme degree of risk to the Pension Fund, but nonetheless proceeded with conscious indifference to the risk to the Pension Fund.

114.   Defendants' breaches of their duty of care have caused the Pension Fund damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment in their favor and against Defendants as follows:

A. Money damages in an amount to be determined at trial, including punitive damages, damages for foregone profits, lost business opportunities, lost investment returns and income;

B. All costs and fees associated with the foregoing and all other related damages, including, but not limited to, attorney's fees and costs to the maximum extent permitted by law, including, but not limited to, ERISA Section 502(g); and

C. Awarding such further relief as this Court deems just and appropriate.

Dated: September 15, 2023

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

By:  /s/Paul R. Fine

Paul R. Fine
Geronimo Perez
Attorneys for Plaintiffs
CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA and the BOARD OF TRUSTEES FOR THE CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA

COMPLAINT

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OF COUNSEL:

SCHULTE ROTH & ZABEL LLP
Ronald E. Richman (*PHV* forthcoming)
William H. Gussman, Jr. (*PHV* forthcoming)
Steven R. Fisher (*PHV* forthcoming)
Andrew B. Lowy (*PHV* forthcoming)


919 Third Avenue
New York, NY 10022
Telephone: 212.756.2000

Attorneys for Plaintiffs
CONSTRUCTION LABORERS PENSION
TRUST FOR SOUTHERN CALIFORNIA
and the BOARD OF TRUSTEES FOR THE
CONSTRUCTION LABORERS PENSION
TRUST FOR SOUTHERN CALIFORNIA

COMPLAINT