F:\GP\2840.017 - SRZ - Meketa\Pleadings\2840.017.complaint.amended.docx

1

DANIELS, FINE, ISRAEL,
SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807
Paul R. Fine, State Bar No. 053514
fine@dfis-law.com
Geronimo Perez, State Bar No. 223657
gperez@dfis-law.com

2

3

4

5

OF COUNSEL:
SCHULTE ROTH & ZABEL LLP
919 THIRD AVENUE
NEW YORK, NY 10022
TELEPHONE: 212.756.2000
Ronald E. Richman (Admitted *PHV*)
ronald.richman@srz.com
William H. Gussman, Jr (Admitted *PHV*)
bill.gussman@srz.com
Andrew B. Lowy (Admitted *PHV*)
andrew.lowy@srz.com

6

7

8

9

10

11

Attorneys For Plaintiffs

12   CONSTRUCTION LABORERS
13   PENSION TRUST FOR SOUTHERN
     CALIFORNIA, and JON PRECIADO,
14   SERGIO RASCON, ADRIAN
     ESPARZA, ALEX ARTIAGA,
15   MICHAEL DEA, HERTZ RAMIREZ,
16   PETER SANTILLAN, JEROME DI
     PADOVA, CATHERINE
17   MONCADA, ALAN LUDWIG, JEFF
18   STEWART, LANCE BOYER, BILL
     BOYD, and JOHN COOPER, as
19   TRUSTEES OF THE
     CONSTRUCTION LABORERS
20   PENSION TRUST FOR SOUTHERN
21   CALIFORNIA, on behalf of the
22   Construction Laborers Pension Plan for
     Southern California
23

24                    UNITED STATES DISTRICT COURT

25                    CENTRAL DISTRICT OF CALIFORNIA

26
     CONSTRUCTION LABORERS            | Case No. 2:23-cv-07726-CAS-PVC
27   PENSION TRUST FOR SOUTHERN       | **AMENDED COMPLAINT**
28

1

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

CALIFORNIA, and JON PRECIADO,
SERGIO RASCON, ADRIAN
ESPARZA, ALEX ARTIAGA,
MICHAEL DEA, HERTZ RAMIREZ,
PETER SANTILLAN, JEROME DI
PADOVA, CATHERINE MONCADA,
ALAN LUDWIG, JEFF STEWART,
LANCE BOYER, BILL BOYD, and
JOHN COOPER, as TRUSTEES OF
THE CONSTRUCTION LABORERS
PENSION TRUST FOR SOUTHERN
CALIFORNIA, on behalf of the
Construction Laborers Pension Plan for
Southern California,

Plaintiffs,

-against-

MEKETA INVESTMENT GROUP, INC.
and JUDY CHAMBERS,

Defendants.

Plaintiffs Construction Laborers Pension Trust for Southern California
(the "Pension Fund") and Jon Preciado, Sergio Rascon, Adrian Esparza, Alex
Artiaga, Michael Dea, Hertz Ramirez, Peter Santillan, Jerome Di Padova, Catherine
Moncada, Alan Ludwig, Jeff Stewart, Lance Boyer, Bill Boyd, and John Cooper, as
Trustees of the Construction Laborers Pension Trust for Southern California, each
on behalf of the Construction Laborers Pension Plan for Southern California (the
"Plan"), by and through their undersigned counsel, for their Amended Complaint
against Defendants Meketa Investment Group, Inc. ("Meketa") and Judy Chambers

("Chambers" and, together with Meketa, "Defendants") hereby allege on the basis of knowledge with respect to themselves and their actions and on the basis of knowledge and information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This action seeks to remedy serious wrongdoing by the Defendants—fiduciaries to the Pension Fund and the Plan—under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  Rather than discharge their duties with the required prudence and care mandated by ERISA, the Defendants failed to provide appropriate advice to the Pension Fund, advising the Pension Fund to enter into an inappropriate infrastructure investment.  Compounding the problem, Defendants then abandoned their obligations to oversee the investment as the infrastructure investment program collapsed under the weight of inexperience and fraud on the part of the managers the Defendants had recklessly recommended to the Pension Fund.

2.      In November 2014, the Pension Fund formally retained Pension Consulting Alliance, Inc. ("PCA")[1] to provide investment consulting services related to a potential Pension Fund investment in an infrastructure fund in which the Pension Fund would be the sole investor.  The Pension Fund retained PCA because

---

[1] Pension Consulting Alliance, Inc. merged with Meketa in or around January 2019 and, upon information and belief, Meketa acquired all of PCA's stock, assets, and liabilities, including its contract with the Pension Fund.  For purposes of this Complaint, PCA and Defendant Meketa shall be used interchangeably, unless otherwise noted.

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

the Pension Fund's regular investment consultant was not able to take on the services PCA took on for the Pension Fund in connection with the infrastructure sector.  PCA represented itself as an expert on investments in infrastructure funds with "years of experience providing advice and insight on infrastructure programs for leading pension plan investors."  In the written retainer agreement between the Pension Fund and PCA (the "PCA Agreement"), PCA agreed to provide its services to the Pension Fund as an ERISA fiduciary—a key part of PCA's pitch to the Pension Fund.  In providing its services to the Pension Fund, PCA was an ERISA fiduciary as a result of exercising discretion concerning the investment of the Plan's assets.

3.     Ultimately, the infrastructure fund was established and named the California Infrastructure Fund I, LP (the "Infrastructure Fund").  The Pension Fund engaged PCA to, among other things:  (i) develop an Infrastructure Investment Policy; (ii) identify, interview, conduct due diligence on, and recommend potential Program Managers for the Infrastructure Fund who would implement the Infrastructure Investment Policy on its behalf and on behalf of the Plan; (iii) provide access to other capital to diversify project risks; (iv) attend meetings of the Board of Trustees of the Pension Fund (the "Board") to review and explain the Infrastructure Fund's investments; and (v) provide research and educational materials to the Board.

AMENDED COMPLAINT

4.      Defendants also expressly agreed in the PCA Agreement to "oversee the Program Manager's strategy, investment selection process, deal pipeline and investment process." Indeed, the PCA Agreement contemplated that PCA would be paid an annual fee of $75,000 "for ongoing program manager due diligence, program monitoring and reporting." That $75,000 annual fee was in addition to a "one-time fee of $50,000 for the program development and policies related to the program." As such, Defendants—whose business focuses on advising multiemployer pension plans—expressly committed to, and did, act as fiduciaries under ERISA. PCA understood that the Board was relying on PCA's investment expertise and experience. Unfortunately for the Pension Fund and the Plan's participants and beneficiaries, the Defendants neglected their duties and caused the Pension Fund to incur massive losses.

5.      Despite their contractual and fiduciary obligations to the contrary, Defendants failed to adequately vet potential Program Managers. Instead, without any appropriate diligence, Defendants recommended Onset Capital Partners, LLC ("Onset Capital"). Critically, when recommending and vouching for Onset Capital, Defendants falsely stated in a presentation to the Pension Fund that Onset had three partners, who each had "on average in excess of 20 years of private equity deal making experience." To the contrary, in 2015, Onset Capital was a limited liability

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

company wholly owned by Wendell McCain.[2]  Defendants failed to inform the Pension Fund or the Plan that Onset Capital's three purported principals—McCain, Eric Perreca, and Charles Snyder, had *never* worked together before and, in fact, had been introduced to each other by Chambers.

6.     Upon Defendants' recommendation, the Pension Fund, through a special purpose limited partner entity, committed to invest $30 million of Plan assets in the Infrastructure Fund to be managed by Onset General Partner, LLC ("Onset"), an entity created and owned by McCain, Perreca, and Snyder through their respective wholly owned limited liability companies.

7.     Unfortunately, and as the Defendants knew or should have known, Onset made a series of ill-advised investment decisions, putting the Pension Fund's capital in nine early stage infrastructure start-up companies (the "Portfolio Companies") with little or no appropriate diligence.

8.     In making those investments, Onset repeatedly failed to follow the guidelines set forth in the Infrastructure Investment Policy, which PCA created and presented to the Board for adoption.  The Infrastructure Investment Policy "established the asset allocation and strategic objectives" for the infrastructure investment portfolio.  In particular, it stated that the infrastructure investment

---

[2]  The *only* individual other than McCain listed on Onset Capital's website during the company's entire engagement with the Pension Fund was Dr. Hamed Reyhanfard, "an accomplished scientists [sic] and market strategist with focus on the pharmaceutical and biotechnology landscape in Middle East."

AMENDED COMPLAINT

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

portfolio was to be comprised of "short term infrastructure opportunities within a tenure of one to five years that have a clear liquidity mechanism."

9.     In the PCA Agreement, Defendants agreed to, among other things, "advise on investment structuring and commitment pacing" and "advise on portfolio construction."  Defendants, who touted themselves to the Pension Fund as experts in infrastructure investments and "one of the earliest players in the infrastructure consulting space," either failed to realize that Onset's investment strategy could never satisfy the Infrastructure Investment Policy's guidelines or hid this truth from the Pension Fund.  Either way, PCA had an obligation to raise this structural issue with the Pension Fund—and failed to do so.

10.     Onset's investments also failed to follow the Infrastructure Policy's guidelines in other ways.  For instance, the Infrastructure Investment Policy required that investments be diversified with respect to life-cycle (*i.e.*, that they be a blend of early and late-stage projects), but all of the nine Portfolio Companies were early stage start-ups with no clear liquidity mechanism.  Further, the Infrastructure Investment Policy required that all projects in which the Infrastructure Fund invested were to be located in California, but Onset instead made several investments in entities whose major infrastructure projects were located overseas or whose market focus lay in other states.

7

11. Defendants, in the exercise of their duty to "oversee the Program Manager's strategy, investment selection process, deal pipeline and investment process," should have, at a minimum, informed the Pension Fund that Onset had failed to comply with the Infrastructure Investment Policy. They consistently failed to do so.

12. As time went on, rather than accept its failures, Onset materially misrepresented the valuation and performance of the investments it had made for the Infrastructure Fund. By 2021, Onset represented to the Pension Fund that the Infrastructure Fund had a value of almost $55 million when, in truth, the portfolio's value—as ultimately determined by an independent third-party after Onset's fraud was discovered—was only about $12.275 million.

13. Instead of fulfilling their fiduciary and contractual obligations by diligently reviewing and monitoring Onset's management of the Infrastructure Fund, Defendants, without appropriate oversight, accepted Onset's fraudulent valuations and repeated them in periodic reports to the Pension Fund on the Infrastructure Fund's "progress." By placing their imprimatur on those inflated valuations, Defendants gave them additional weight. In sum, Defendants were asleep at the wheel, even though they knew that the Pension Fund was relying on their oversight and guidance—and paying them $75,000 per year—to safeguard Plan assets and the hard-earned retirement money of the Plan's participants and beneficiaries.

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

14.   The Infrastructure Fund's performance was so abysmal that, by 2021, seven of the nine Portfolio Companies had no revenue and five of the nine had little to no cash on hand.  Consequently, many of the Portfolio Companies required additional large cash infusions to stay in business.  Desperate to avoid a collapse, which surely would expose their fraud, Onset approached the Pension Fund with requests for significant additional capital to support the failing Portfolio Companies.  Those requests should have, at a minimum, alerted Defendants to potential problems at Onset.  Yet Defendants never investigated further or raised issues; instead, they reflexively recommended that the Pension Fund provide the requested capital.  Unfortunately, by this time, the operating performance of the Portfolio Companies had deteriorated to the point where their value was permanently impaired.

15.   Although the incongruity between the reported performance of the portfolio—supported by Defendants' "reviews"—and Onset's push for more cash apparently did not trouble Defendants, it eventually triggered alarm bells at the Pension Fund.  As a result, the Pension Fund hired additional third-party advisors to conduct a review of the Infrastructure Fund's investments—a review that should have been conducted, or at least recommended, by Defendants, who had a fiduciary obligation to review Onset's management of the portfolio.  It quickly became apparent to the third-party advisors that at least three of the nine Portfolio Companies were worthless—something that Defendants (professional investment

9

advisors who represented to the Pension Fund that they had "established $10 billion of infrastructure portfolios for public pension plans") either knew or would have uncovered had they been diligent in the exercise of their fiduciary duties.

16.     In investing in the Infrastructure Fund, the Pension Fund was relying on both Defendants' purported expertise in the field of infrastructure investment and Defendants' adherence to their fiduciary obligations to the Pension Fund and the Plan.

17.     Were it not for Defendants' wrongful behavior and manifest breaches of contractual and fiduciary duties in vetting prospective managers, Onset would never have been in a position to manage the Infrastructure Fund.  Defendants failed to act prudently in recommending Onset as manager and, as a result, the Pension Fund suffered large losses.

18.     Moreover, had Defendants adequately monitored and reviewed the performance of the Infrastructure Fund, instead of imprudently turning a blind eye in derogation of their fiduciary duties, the Pension Fund would have discovered Onset's fraud and mismanagement years sooner, saving millions of dollars of hard-earned retirement savings of Southern California's construction workers.

19.     The Pension Fund now brings this action to enforce Defendants' liability under ERISA, which requires breaching fiduciaries to make the Pension Fund and the Plan whole from losses resulting from their fiduciary breaches.

AMENDED COMPLAINT

Chambers is personally liable as a fiduciary under ERISA Section 409, 29 U.S.C. § 1109(a), including because she undertook her duties with respect to the Pension Fund and the Plan as a fiduciary under ERISA.  In the alternative, Defendants are liable in an amount to be determined at trial for Defendants' breaches of their common law fiduciary duty and/or negligence/gross negligence.  Finally, Meketa is liable in an amount to be determined at trial for its breaches of the PCA Agreement.

## THE PARTIES

20.     Plaintiff Pension Fund is a Taft-Hartley pension fund administered by the Board, with an equal number of trustees selected by employers that contribute to the Pension Fund and the Southern California District Council of Laborers for and on behalf of the District Council and its affiliated Local Unions of the Laborers' International Union of North America, A.F.L.-C.I.O.  The Pension Fund was established and is maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5).

21.     The Board sponsors and administers the Plan, which is a multiemployer plan within the meaning of Section 3(37) of ERISA.

22.     Plaintiffs Jon Preciado, Sergio Rascon, Adrian Esparza, Alex Artiaga, Michael Dea, Hertz Ramirez, Peter Santillan, Jerome Di Padova, Catherine Moncada, Alan Ludwig, Jeff Stewart, Lance Boyer, Bill Boyd, and John Cooper, as

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

Trustees of the Pension Fund, are fiduciaries of the Plan and are authorized to bring this action under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

23.   Defendant Meketa is a Massachusetts corporation with a principal place of business at 80 University Ave, Westwood, MA 02090.  Meketa is registered with the California Secretary of State to conduct business in California and has been since 2002.

24.   Defendant Chambers is a Managing Principal and Private Markets Consultant at Meketa.  At all relevant times Chambers was employed by Meketa or its predecessor firm, PCA.  At times relevant herein, Chambers was listed as a Secretary of PCA when PCA was registered to do business in California with the California Secretary of State.  Upon information and belief, Chambers resides in New York.

## JURISDICTION AND VENUE

25.   This Court has subject matter jurisdiction in this ERISA matter pursuant to 28 U.S.C. § 1331 and ERISA Section 502, which provides for federal jurisdiction over issues under Title I of ERISA.

26.   This Court may exercise subject matter jurisdiction over all other claims in this Complaint pursuant to 28 U.S.C. § 1367.

27.   This Court has personal jurisdiction over Defendants because they transacted business in this District and have significant contacts with this District.

12

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

28.     Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because the Pension Fund is administered in this District and some or all of the violations of ERISA occurred in this District.

## FACTS

### Defendants are Retained as Consultants by the Pension Fund

29.     In mid-2014, the Pension Fund decided to diversify its investments by investing in infrastructure projects within the State of California.

30.     On September 9, 2014, Chambers traveled to El Monte, California to make a presentation on behalf of PCA to the Board (the "September 2014 Presentation").  A true and accurate copy of the September 2014 Presentation is attached as **Exhibit A**.  In the September 2014 Presentation, PCA asserted that it had "years of experience providing advice and insight on infrastructure programs for leading pension plan investors" and pitched a number of consulting services to the Pension Fund, including:

- Fiduciary:  Serve as a fiduciary to the pension plan;

- Infrastructure Program Development:  Work with the Trustees and Staff to develop and implement a unique investment platform targeting Southern California infrastructure projects that generate competitive risk adjusted returns and create employment;

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

- Investment Policy Development:  Create a comprehensive investment policy that reflects the Laborers' objectives and sensitivities; and

- Manager Due Diligence and Selection:  Identify and perform due diligence on potential program manager(s) that will source and properly structure investment opportunities with sound risk/return profiles.

31.    Following the September 2014 Presentation, on November 14, 2014, the Pension Fund and PCA entered into the PCA Agreement to memorialize the terms of PCA's engagement.  A true and accurate copy of the PCA Agreement is attached as **Exhibit B**.  Chambers was the signatory on behalf of PCA.

32.    Under the PCA Agreement, PCA agreed to provide the Pension Fund with a broad range of investment consulting services with respect to the planned infrastructure investment.  The PCA Agreement expressly provided that PCA "would contract as a fiduciary on behalf of the [Pension Fund]."  PCA agreed to exercise, and ultimately did exercise, discretion concerning the investment of the Plan's assets.

33.    PCA routinely provided investment advice to the Pension Fund in exchange for a fee.  Between 2014 and 2020, the Pension Fund paid Defendants at least $575,000 for their services pursuant to the PCA Agreement.  In turn, Defendants routinely reviewed, approved, and provided advice on specific infrastructure investments.  For example, on at least two occasions, Chambers wrote

AMENDED COMPLAINT

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

letters to the Board providing advice on specific investments suggested by Onset.  In addition, Onset directed capital call requests for specific infrastructure investments to Chambers, who reviewed and approved those requests, including on May 10, 2018, July 6, 2018, September 9, 2018, and October 30, 2018.  Defendants also routinely reviewed and approved Onset's fund performance summaries and presentations before Onset made its presentations to the Board.

34.   Among other things, the PCA Agreement obligated PCA to perform services relating to Infrastructure Investment Program Development and Program Manager Search and Due Diligence.

35.   With respect to Infrastructure Investment Program Development, PCA agreed to: (i) "assist in developing a unique investment platform that captures objectives of the [Pension Fund]"; (ii) "review/develop investment strategy, policies, procedures, goals and objectives"; (iii) "oversee the Program Manager's strategy, investment selection process, deal pipeline and investment process"; (iv) "implement responsible contracting policies and procedures"; (v) "assess risk profiles of various sub-asset types"; (vi) "propose benchmark and risk measures"; (vii) "assist with portfolio target allocation and ranges"; (viii) "advise on investment structuring and commitment pacing"; and (ix) "advise on portfolio construction."

36.   With respect to the Program Manager Search and Due Diligence, PCA agreed to: (i) "identify, interview and conduct due diligence on potential Program

Manager(s) who will have investment discretion"; (ii) "negotiate terms with the Program Manager on behalf of the [Pension Fund]"; and (iii) "provide client with periodic updates on potential investment opportunities as they arise."

37.     Pursuant to the PCA Agreement, PCA received (i) a one-time fee of $50,000 for "Phase I," which included "program development and policies related to the program" and (ii) an annual fee of $75,000 for "Phase II," which included "on-going program manager due diligence, program monitoring and reporting."  In total, the Pension Fund paid Defendants at least $575,000 for their services pursuant to the PCA Agreement.

**Defendants Prepare the Infrastructure Investment Policy**

38.     Following the execution of the PCA Agreement, PCA and Chambers developed the Infrastructure Investment Policy for the Pension Fund.  The Infrastructure Investment Policy was implemented to "ensure[] that investors, managers, consultants, or other participants selected by the [Pension Fund] take prudent and careful action while managing the Portfolio."  It also made clear that PCA, as the "General Consultant," would bear responsibility to review the Portfolio and report directly to the Board.  A true and accurate copy of the Infrastructure Investment Policy is attached as **Exhibit C**.

39.     On December 9, 2014, Chambers—again traveling to El Monte, California—presented the Infrastructure Investment Policy to the Board.  At

16

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

Chambers's recommendation, the Board voted to adopt the Infrastructure Investment Policy at this meeting.

40.     The Infrastructure Investment Policy outlined four investment objectives that were to guide the Infrastructure Fund's manager in making investments.  These objectives were: (i) "To provide improved diversification to the overall [Pension Fund's] Investment Portfolio;" (ii) "To generate an enhanced yield to the actuarial earning rate assumption and provide stable cash flows;" (iii) "To preserve investment capital;" and (iv) "To act as a responsible steward of infrastructure investments through responsible contracting and environmental practices, efficient operation of assets, and production of quality services and products."

41.     The Infrastructure Investment Policy also contained a section entitled "Infrastructure Sectors and Characteristics" with a subsection entitled "Allocation," which outlined how the Infrastructure Fund's manager was obligated to allocate invested funds.  Specifically, the "Allocation" subsection provided that "funds will be allocated to infrastructure projects located in California that will achieve the objectives of the Infrastructure Portfolio as previously outlined."

42.     Additionally, among other things, the Infrastructure Investment Policy obligated the Infrastructure Fund manager to "make short term investments with a term from one to five years" and, even considering market volatility, use its "best

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

17

efforts … to keep segments within the recommended ranges given the short term investment preference."

43.     The Infrastructure Investment Policy also contained a section titled "Investment Policy Guidelines."  A subsection entitled "Investment Life Cycle" indicated that to combat risk, the Infrastructure Fund manager should ensure the portfolio was "appropriately diversified according to life cycle," including "predevelopment, development, leasing, operating, and redevelopment."  In other words, the Infrastructure Investment Policy required the Infrastructure Fund manager to select a blend of investments at different stages in their life-cycle, not to focus exclusively, or primarily, on early- or late-stage investments.

44.     The "Investment Policy Guidelines" section also provided that "[i]nvestments in infrastructure assets should have clearly articulated and viable exit strategies through which assets can be disposed of or liquidated."  This is because "the goal of the program is to invest in short term infrastructure opportunities within a tenure of one to five years that have a clear liquidity mechanism."

45.     The Infrastructure Investment Policy was not limited to setting forth the obligations of the prospective Infrastructure Fund's management; it also enumerated the responsibilities of the "General Consultant"—PCA and, later, Meketa— including the responsibility to "monitor the investment process for compliance with this policy."

18

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

46.     The Infrastructure Investment Policy described PCA's monitoring

obligations.  Specifically, the policy provided that the manager's "selection of

infrastructure investments shall be guided by the 'prudent expert' standard,

embracing the prudent decision-making process typically employed by experts in

the areas of infrastructure acquisition, development, operation, disposition, and

portfolio management."  PCA, as General Consultant, was required to ensure

compliance with that standard.

47.     To guide PCA in its evaluation of potential Infrastructure Fund

managers, the Infrastructure Investment Policy provided that:

> prospective Investment Managers shall be evaluated for
> selection based on criteria including, but not limited to: (i)
> the suitability of the organization's investment, relative to
> the Plan's investment guidelines and objectives; (ii) the
> quality, stability, integrity, and experience of the
> management team; (iii) the ability and willingness of the
> organization to dedicate sufficient resources and personnel
> to optimally manage the Plan's investments; (iv) the
> reasonableness of investment terms and conditions,
> including provisions to align interests of management and
> the Plan; (v) the appropriateness of management controls
> and reporting systems; and (vi) commitment to responsible
> contracting policies, workplace diversity, and community
> involvement.

48.     The Infrastructure Investment Policy also imposed on PCA, as General

Consultant, an obligation to monitor and evaluate Infrastructure Fund managers.  In

particular, it provided that (i) "investment managers shall be monitored and

evaluated continuously, based on their performance relative to stated objectives and

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

benchmarks, and relative to the performance of firms managing similar investments in the marketplace" and (ii) "investment managers shall be monitored for compliance with investment guidelines, policies, and procedures of the Infrastructure Portfolio, and other contractual provisions."

**Defendants Fail to Adequately Vet Managers or Advise the Pension Fund on the Size and Structure of Investment**

49.      On March 10, 2015, PCA and Chambers attended a Board meeting in El Monte, California in person and presented the Pension Fund with their preliminary assessment of potential investment managers to implement the Infrastructure Investment Policy and manage the Infrastructure Fund (the "March 2015 Presentation").  A true and accurate copy of the March 2015 Presentation is attached as **Exhibit D**.  Chambers was PCA's lead presenter at the meeting.

50.      According to the March 2015 Presentation, Chambers and PCA reviewed eight potential managers.  Among the eight managers was Onset Capital Partners, which the March 2015 Presentation portrayed as an established manager that was "[f]ounded in 2010 by Wendell McCain," had three partners, and specialized in "Core Infrastructure" investments.  Elsewhere, the March 2015 Presentation referred to Onset as an "[e]xperienced investment manager."

51.      The March 2015 Presentation's portrayal of Onset Capital was deliberately misleading, at best.  Critically, it failed to mention that Onset Capital's three purported "partners"—Wendell McCain, Eric Perreca, and Charles Snyder—

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

had *never* worked together prior to Onset's engagement as the Infrastructure Fund's manager. Indeed, Chambers had a direct role in Onset's creation. She introduced Onset's three partners to each other for the exclusive and express purpose of managing the Pension Fund's investment. PCA hid this relevant fact from the Board.

52.     Given that Onset's three principals had never worked together and Onset Capital was an entity wholly owned by McCain that, upon information and belief, did not focus on infrastructure investments prior to Onset's selection as the Infrastructure Fund manager, the March 2015 Presentation's description of Onset Capital as a manager that had been operating in the area of "Core Infrastructure" investments for approximately five years was misleading at best. Defendants concealed Onset Capital's lack of relevant experience in their presentation to the Board, and they knew or should have known that their portrayal of Onset in the March 2015 Presentation would mislead the Pension Fund into believing that it was hiring an experienced, established manager.

53.     Defendants' reason for portraying Onset in a false light was plain— despite its lack of experience or track record, PCA already had decided to recommend that the Pension Fund retain Onset as the Infrastructure Fund manager. Upon information and belief, Chambers's decision to recommend Onset was influenced by her personal relationship with McCain—the two had attended

AMENDED COMPLAINT

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

business school together—which Chambers failed to disclose to the Pension Fund prior to Onset's retention.

54.     Even worse, Chambers and PCA failed to inform the Pension Fund of certain facts concerning McCain and Onset that would have caused serious concern about the Pension Fund retaining Onset as the Infrastructure Fund Manager.  For example, Defendants failed to disclose that, prior to Onset's retention, McCain's driver's license had been suspended or revoked for unknown reasons and he had had been cited in North Carolina on numerous occasions over a ten-year-period for driving without a license.  Upon information and belief, Defendants were aware of these facts and failed to disclose them to the Pension Fund prior to Onset's engagement.

55.     Nor did Defendants disclose facts arising during Onset's tenure as the Infrastructure Fund manager that would have caused the Pension Fund to seriously reconsider its ongoing relationship with Onset.  For instance, upon information and belief, McCain faced significant financial difficulties during the period of his engagement with the Pension Fund, resulting in hundreds of thousands of dollars in state and federal tax liens and the foreclosure of a property he owned in Massachusetts.  The Pension Fund plainly would have wanted to know about these financial difficulties, as they could have given rise to conflicts of interest on the part of McCain.  Further, Defendants neglected to inform the Board of other relevant,

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

time-consuming commercial activities purportedly undertaken by Onset Capital and McCain which bore directly on the character of Onset's principals, including an alleged (failed) scheme in early 2020 to distribute personal protective equipment in partnership with a known felon that resulted in a lawsuit against Onset Capital and McCain in the Southern District of New York.  *See Asyndeton SA v. Onset Capital Partners, et al.*, Civil Action No. 1:23-cv-01536 (S.D.N.Y.).

56.     Nevertheless, PCA in its March 2015 Presentation recommended that the Pension Fund's Board meet *only* with Onset.  In justifying that recommendation, Defendants claimed that the "Onset team has demonstrated experience in identifying, financing and executing transactions in numerous sectors," that Onset was an "[e]xperienced investment manager," that Onset had shown a "[w]illingness to focus on an economically targeted investment program," and that Onset provided a "[n]etwork of resources for deal sourcing."

57.     Demonstrating that Onset's status as manager was effectively already decided, the March 2015 Presentation referred to Onset as "the manager," stated that PCA wanted to present "the manager" at the Pension Fund's April meeting, and requested permission from the Pension Fund to begin negotiating a contract with Onset.

58.     At no time did Chambers or PCA advise the Pension Fund that an initial investment of only $30 million in a "fund of one" was inadequate to

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

accomplish the Pension Fund's goals of realizing a return on infrastructure investment in only approximately five years.  Nevertheless, in violation of their fiduciary duties, Chambers and PCA continued to advise moving forward with the project.

59.    Moreover, to the extent that potential managers other than Onset were unwilling to serve as the Infrastructure Fund's manager due to concerns about the structure or investment objectives of the Infrastructure Fund, Defendants had a duty to inform the Pension Fund of that fact and advise that PCA had serious concerns about whether the Pension Fund's infrastructure investment plan could be successful.

60.    Based on Chambers's and PCA's recommendation and urging, the Pension Fund chose Onset as the Program Manager responsible for managing the infrastructure investment and created a limited partner entity to invest $30 million in the Infrastructure Fund, as the sole investor.  Onset officially became the general partner in January of 2016.

61.    As set forth above, PCA had a contractual and fiduciary obligation to oversee the "strategy, investment selection process, deal pipeline and investment process" of the Program Manager (*i.e.*, Onset) and was paid an ongoing fee of $75,000 per year to carry out those responsibilities up until the time Meketa was terminated effective September 30, 2020.

24

**Onset Fails as Manager While Defendants Are Asleep at the Wheel**

62.     Once Onset was installed as general partner of the Infrastructure Fund, it repeatedly allocated funds to infrastructure investments without first conducting appropriate diligence and failed to follow the investment guidelines PCA had created in the Infrastructure Investment Policy.  Between March of 2016 and October of 2018, Onset invested the Pension Fund's $30 million investment in nine Portfolio Companies.

63.     The Portfolio Companies were incompatible with the Infrastructure Investment Policy from the outset, something Defendants knew or should have known.  All of the investments were in very early stage companies, akin to venture capital investments.  Moreover, at least three of the Portfolio Companies were focused, in part, on infrastructure projects located outside California.  As such, the portfolio of investments was constructed in a manner that was inconsistent with the mandates in the Infrastructure Investment Policy that, among other things, (i) the portfolio be diversified with respect to the life cycle of infrastructure investments and (ii) funds be allocated to infrastructure projects located in California.

64.     Defendants, who were responsible for monitoring Onset's actions as investment manager, did not inform the Pension Fund that Onset was investing the Infrastructure Fund's money in a manner that violated the Infrastructure Investment Policy and would doom the Infrastructure Fund to failure.  Thus, either Defendants

AMENDED COMPLAINT

failed to adequately fulfill their duties to monitor Onset and ensure compliance with the Infrastructure Investment Policy, or Defendants failed to disclose Onset's repeated violations of the Infrastructure Investment Policy to the Board. In either case, Defendants breached their fiduciary duties under ERISA.

65.    Defendants—professional investment consultants with vast experience in infrastructure investing—were in the best position to, and had a fiduciary and contractual obligation to, review Onset's portfolio construction and alert the Pension Fund to Onset's wrongful actions. They did not do so.

66.    Instead, Chambers and PCA did the opposite. In at least one case, PCA endorsed an investment in one Portfolio Company, Repower Capital, in a March 8, 2016 letter. Chambers and PCA did so despite acknowledging that Repower Capital's "growth estimates are aggressive and may take longer to materialize." In other words, despite knowing that the investment fell outside the parameters of the Infrastructure Investment Policy, Chambers and PCA endorsed it, and noted that the "investment appears to be reasonable."

67.    In addition, Chambers regularly reviewed and approved draft Board presentations prepared by Onset regarding the Infrastructure Fund's portfolio and performance and attended Board meetings at which Onset presented to the Board on those issues. For instance, during Onset's tenure as the Program Manager, Chambers attended more than twenty-five Board meetings at which one or more of

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

Onset's principals either presented to the Board or discussed the Infrastructure Fund's investments.  At no point did Chambers or anyone else at PCA raise any concern about Onset's investments or its repeated failures to adhere to the requirements set by the Infrastructure Investment Policy.

68.     Onset also failed to adequately manage the investments that it made. Onset's principals did not spend the necessary time working with the Portfolio Companies to assist with their development, as they were contractually obligated to do.  This fact was, or should have been, obvious to PCA and Chambers.  Had Chambers and PCA properly monitored Onset and reported these red flags to the Pension Fund, they would have prevented, or at least limited, the Pension Fund's losses.

69.     Given the lack of any meaningful diligence into the Portfolio Companies or involvement by Onset's principals in their development, the Portfolio Companies struggled from the very beginning.  Onset, with no meaningful oversight from Chambers and PCA, hid the true—declining—value of the Portfolio Companies from the Pension Fund.  It did so by placing values on the Infrastructure Fund's investments that did not bear any semblance to true market values and covered up the fact that the Infrastructure Fund's investments were dropping in value.  Indeed, while the Infrastructure Fund was declining in value, Onset

AMENDED COMPLAINT

repeatedly referred to (false) increases in rates of return for the portfolio in making presentations and reporting valuation and performance to the Pension Fund.

70.     Defendants, again, were asleep at the wheel, ignoring or failing to recognize numerous red flags that should have indicated to them that there was a serious problem with Onset's investments.  Had Chambers and PCA been exercising adequate oversight, they would have seen those red flags and brought them to the Pension Fund's attention, thereby limiting the losses suffered by the Pension Fund.

71.     For example, in 2017 Onset claimed the value of the Infrastructure Fund's assets to be almost $14 million, far above their true market value.  This pattern continued in subsequent years.  Onset claimed that the value of the Infrastructure Fund's assets was approximately $32.2 million as of December 31, 2018.  Onset stated that the value of the Infrastructure Fund's assets was approximately $44.6 million as of December 31, 2019.  Onset alleged that the Infrastructure Fund's asset value was approximately $54.9 million as of December 31, 2020.

72.     The valuation metrics Onset used were fundamentally flawed and deviated from industry standards.  As a result, all of the asset values were dramatically and intentionally overstated to paint a picture that the value of the Infrastructure Fund was growing when, in fact, the investments were struggling and

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

28

rapidly losing value.  Defendants never questioned Onset's valuations, underscoring the lack of oversight.

73.     As subsequently determined by an independent valuation firm, the market value of the Portfolio Companies was dramatically less than Onset represented, which Defendants allowed to go unchallenged.  The independent valuation firm, Impact Capital Group, concluded that the valuation of the Portfolio Companies was only $13.025 million and $12.275 million as of December 31, 2020 and December 31, 2021, respectively—down from over $30 million invested.  The December 31, 2020 valuation of just over $13 million was over $40 million less than the inflated number put forth by Onset.

74.     Although the Pension Fund retained an independent valuation firm to determine the full scope of Onset's wrongdoing, Defendants, in the proper exercise of their fiduciary duties and with their stated expertise, plainly should have recognized that Onset's representations of the Portfolio Companies' value was drastically inflated.

75.     Onset's fraud was only possible because the Defendants abandoned their fiduciary and contractual duties to review and monitor Onset's investment program.  Had they behaved prudently and not wholly endorsed Onset's behavior, the Pension Fund would have recognized Onset's fraud earlier than it did.

AMENDED COMPLAINT

76.     Specifically, Onset, under Defendants' noses, was manipulating the valuation process by using speculative and baseless methods for valuing different Portfolio Companies.  A review of Onset's own valuation memoranda demonstrates an inconsistent approach to valuation and incomplete use of financial tools.  In some cases, assumptions relied on a theoretical IPO occurring, and in other cases there was no reliance on operating results to arrive at a value.  These actions reveal a conscious effort to provide a false view of the individual companies and to present to the Pension Fund ever-rising values, when in fact the portfolio was declining precipitously.

77.     Defendants, as experts in the infrastructure investing space, should have recognized that Onset was employing inconsistent and flawed methods to value the Portfolio Companies, which, again, would have raised red flags that something was amiss at Onset.

78.     Moreover, with respect to several of the Portfolio Companies in which the Infrastructure Fund had debt investments, Onset simply assumed that the Portfolio Company would repay the Infrastructure Fund the principal, all accrued interest, and fees.  Onset made these assumptions even though the Portfolio Companies were in payment default on the loans.  Defendants, in the exercise of their fiduciary duty and expertise, should have easily recognized that those assumptions were unrealistic and unsupportable.

AMENDED COMPLAINT

79.    For example, Onset made such an assumption with respect to the Infrastructure Fund's investment in Oceanus Power and Water, LLC ("Oceanus"). Without basis, and notwithstanding that Oceanus was in default on the loan from the Infrastructure Fund, Onset assumed for purposes of its valuation that Oceanus would repay the debt in full, plus all accrued and deferred interest.

80.    Onset also engaged in restructuring transactions with some of the Portfolio Companies in which the entire amount of unpaid principal and interest on a loan in deep payment default was rolled up into a new loan. This new loan would appear as current and not in default. In reality, however, it constituted all the uncollected principal and overdue interest of the old loans. By doing this, Onset gave the false impression to the Pension Fund that the loan would be fully collected.

81.    Defendants should have recognized the aforementioned transactions and accounting tricks for what they were—an attempt by Onset to hide losses.

82.    For example, Onset employed this approach in valuing the Infrastructure Fund's loan to Phelan Park 1, LLC ("Phelan"), a Portfolio Company with a plan to convert biological fuel into electricity. Onset initially caused the Infrastructure Fund to loan $500,000 to Phelan. Phelan defaulted on this loan in December 2020. Despite that, Onset loaned additional sums on at least two other occasions in 2021, each time, rolling over the defaulted amount into a new loan and treating the new loan as a good loan and fully collectible. This allowed Onset to

AMENDED COMPLAINT

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

claim an increase in the value of the Infrastructure Fund while, in actuality, no such gains existed.

83.    Onset ultimately invested almost $4.1 million of the Pension Fund's money into the Phelan investment in this way.  In 2020 Onset valued the total investment in Phelan at just under $4 million (approximately $3.5 million in debt and $450,000 in equity).  The Phelan investment was worth zero by December 31, 2020.  Had PCA fulfilled its duties under the PCA Agreement, it would have recognized and reported to the Pension Fund that Onset's valuation was inflated.

84.    Defendants provided no meaningful oversight and never alerted the Pension Fund to any issues with respect to Onset's fraudulently inflated valuations. Indeed, instead of alerting the Pension Fund to the myriad irregularities in Onset's valuations, Defendants parroted those valuations to the Pension Fund in a series of "Portfolio Reviews," accepting Onset's baseless valuations without inquiry and neglecting their fiduciary duties.

**The Pension Fund Discovers the Onset Fraud and Defendants' Oversight Failures**

85.    By a letter dated January 25, 2019, Chambers notified the Pension Fund of the merger between PCA and Meketa, and the Pension Fund consented to the assignment of the PCA Agreement to Meketa.  Upon information and belief, Meketa assumed all of PCA's liabilities as a result of the merger.

32

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

86.     In August 2019, the Pension Fund changed investment advisers from Merrill Lynch to NEPC, LLC ("NEPC").  By April 2020, the Pension Fund was considering consolidating advisers and replacing Meketa with NEPC to oversee Onset.

87.     In or around that time, in the Spring of 2020, Meketa requested an additional $1 million from the Pension Fund for Onset to invest one of the Portfolio Companies, GeoGenCo.  NEPC, now serving as the investment adviser for the Pension Fund, vetted the investment.  NEPC concluded that although it could not opine on the additional investment's prospects, it was certain that there would never be a return on GeoGenCo absent the additional capital.  NEPC also stated that it was unable to find support for the valuation of GeoGenCo that Meketa and Onset were claiming.  Plainly, had Meketa been fulfilling its obligations, it, like NEPC, would have realized the GeoGenCo valuation lacked adequate support.

88.     Shortly thereafter, in August of 2020, Chambers was notified by email of the Pension Fund's intent to terminate Meketa's services, effective September 30, 2020.

89.     By May 2021, a number of the Infrastructure Fund's Portfolio Companies desperately needed more cash to continue to operate at all.  Onset— rather than risk a collapse of the Portfolio Companies that would expose its fraud— approached the Pension Fund to request significant, additional capital infusions into

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

AMENDED COMPLAINT

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

the Infrastructure Fund.  In the same report where Onset reported an Infrastructure Fund value of $54.9 million to the Pension Fund, it requested an additional $11 million in funding for certain Portfolio Companies.

90.     There was a tension, however, in the portrait being painted of the Infrastructure Fund by Onset and the request for so much new funding being made to the Pension Fund.

91.     The Pension Fund hired additional professional advisors to independently review the financial condition of the Infrastructure Fund—what Defendants should have been doing or should have recommended—ultimately leading the Pension Fund to replace Onset as general partner.

92.     An independent valuation of the portfolio concluded that, as of December 31, 2020, the Portfolio Companies had a combined valuation of only $13,025,000 (compared to approximately $30.5 million of called capital invested and a purported $48.5 million valuation being touted by Onset).  Three of the Portfolio Companies were worth zero; one was worth less than 10% of the original amount invested; three others had declined by more than 50%; and all nine Portfolio Companies had declined in value.

## FIRST CAUSE OF ACTION
## Breach of Fiduciary Duty Under ERISA Against All Defendants

93.     The Pension Fund repeats and incorporates by reference the allegations contained in Paragraphs 1 through 92 of this Complaint.

34

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

94.    Defendants agreed to exercise, and did exercise, discretion concerning the investment of the Plan's assets.

95.    Defendants are fiduciaries of the Pension Fund and the Plan under ERISA within the meaning of ERISA Section 404.

96.    ERISA Section 404 imposes fiduciary duties of prudence upon Defendants in their work on behalf of the Pension Fund and the Plan.

97.    ERISA Section 404 further imposes fiduciary duties to follow relevant governing documents upon Defendants in their work on behalf of the Pension Fund and Plan.

98.    Specifically, Defendants had a fiduciary duty to adequately: (1) identify, interview, and conduct due diligence on Onset or any other prospective managers for the Infrastructure Fund; (2) supervise and provide oversight over Onset as manager of the Infrastructure Fund; and (3) ensure that Onset complied with the Infrastructure Investment Policy.

99.    Defendants breached these duties by failing to employ a prudent process to: (1) identify, interview, and conduct due diligence on prospective Infrastructure Fund managers; (2) supervise and provide meaningful oversight over the Infrastructure Fund manager; and (3) ensure the Infrastructure Investment Policy was complied with.

AMENDED COMPLAINT

100.   Defendants further breached their fiduciary duties by violating the terms of the Infrastructure Investment Policy which, following adoption by the Board, is a plan document within the meaning of ERISA Section 404(a)(1)(D).

101.   Defendants' failure to discharge their duties with respect to the Pension Fund and the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breached their duties under ERISA Section 404.

102.   As a result of Defendants' breaches of fiduciary duty of prudence the Pension Fund and the Plan suffered objectively unreasonable and unnecessary monetary losses.

103.   Defendants are liable under ERISA Sections 409 and 502 to make good to the Pension Fund and the Plan losses resulting from the breaches and to restore to the Pension Fund any profits resulting from the breaches of fiduciary duties alleged in this Count.

104.   Defendants are further subject to other equitable relief pursuant to ERISA Section 409 and 502.

105.   Defendants are further liable for attorney's fees and costs under ERISA Section 502(g).

///

AMENDED COMPLAINT

## SECOND CAUSE OF ACTION
## Breach of Contract Against Meketa

106.   The Pension Fund repeats and incorporates by reference the allegations contained in Paragraphs 1 through 105 of this Complaint.

107.   The PCA Agreement is a valid and binding contract between PCA and the Pension Fund.

108.   Meketa is the successor in interest to PCA by way of its merger with PCA and has assumed PCA's liability under the PCA Agreement.

109.   The Pension Fund performed its obligations pursuant to the PCA Agreement.

110.   PCA breached the PCA Agreement by failing to adequately vet potential managers, including Onset.

111.   Specifically, the PCA Agreement obligated PCA to identify, interview, and conduct due diligence on potential managers for the Infrastructure Fund.

112.   PCA breached this obligation by, among other things, failing to adequately vet or otherwise perform due diligence on Onset as evidenced by Onset's manifest incompatibility with the requirements for a manager.

113.   PCA and Meketa further breached the PCA Agreement by failing to adequately monitor Onset's work as general partner to the Infrastructure Fund to ensure compliance with the Infrastructure Investment Policy.

AMENDED COMPLAINT

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

114.  Specifically, the PCA Agreement obligated PCA and Meketa to develop and oversee the implementation of the Infrastructure Investment Policy.

115.  PCA and Meketa breached this obligation by, among other things, failing to adequately oversee Onset's strategy, investment selection proves, deal pipeline, and investment process and alert the Pension Fund that Onset was not complying with the Infrastructure Investment Policy.

116.  The Pension Fund has been damaged by Defendants' breaches in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Breach of Common Law Fiduciary Duty Against All Defendants

117.  The Pension Fund repeats and incorporates by reference the allegations contained in Paragraphs 1 through 116 of this Complaint.

118.  This cause of action is pled in the alternative to the First Cause of Action pursuant to Federal Rule of Civil Procedure 8(d)(2).

119.  Defendants owed certain common law fiduciary duties to the Pension Fund, including duties of loyalty and care.

120.  Indeed, pursuant to the PCA Agreement, which Meketa assumed PCA's liability for, Defendants assumed a fiduciary duty to the Pension Fund.

121.  Defendants intentionally ignored these duties and willfully and with malice engaged in acts against the interests of the Pension Fund and for their own benefit.

38

122. Defendants breached their fiduciary duties to the Pension Fund by, among other things:

      a.    Failing to properly oversee Onset's strategy, investment selection process, deal pipeline and investment process;

      b.    Failing to propose benchmark and risk measures;

      c.    Failing to assist with portfolio target allocation and ranges;

      d.    Failing to appropriately advise on investment structuring and commitment pacing;

      e.    Failing to appropriately advise on portfolio construction; and

      f.    Failing to adequately identify, interview and conduct due diligence on Onset or any other prospective managers for the Infrastructure Fund.

123. Defendants elevated their interests above those of the Pension Fund by failing to adequately vet and monitor Onset in violation of the Infrastructure Investment Policy's, refusing to expend any time or resources to protect the interests of the Pension Fund.

124. The Pension Fund has been damaged by Defendants' breaches in an amount to be determined at trial.

125. The Pension Fund is also entitled to punitive damages as a result of the Defendants' malicious conduct.

///

## FOURTH CAUSE OF ACTION
### Negligence/Gross Negligence Against All Defendants

126.    The Infrastructure Fund repeats and incorporates by reference the allegations contained in Paragraphs 1 through 125 of this Complaint.

127.    This cause of action is pled in the alternative to the First Cause of Action pursuant to Federal Rule of Civil Procedure 8(d)(2).

128.    Defendants owed the Pension Fund a duty of care to perform their work in a reasonable manner.

129.    Defendants breached those duties by failing to exercise a reasonable duty of care performing its work, including, among other ways:

a.    Failing to properly oversee Onset's strategy, investment selection process, deal pipeline and investment process;

b.    Failing to propose benchmark and risk measures;

c.    Failing to assist with portfolio target allocation and rangers;

d.    Failing to appropriately advise on investment structuring and commitment pacing;

e.    Failing to appropriately advise on portfolio construction; and

f.    Failing to adequately identify, interview and conduct due diligence on Onset or any other prospective managers for the Infrastructure Fund.

130.    Defendants knew at the time of its actions that negligently performing their oversight and monitoring tasks, where they were the only parties obligated to

AMENDED COMPLAINT

do so, involved an extreme degree of risk to the Pension Fund, but nonetheless

proceeded with conscious indifference to the risk to the Pension Fund.

131.   Defendants' breaches of their duty of care have caused the Pension

Fund damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment in its favor and against

Defendants as follows:

A.   Money damages in an amount to be determined at trial, including punitive damages, damages for foregone profits, lost business opportunities, lost investment returns and income;

B.   All costs and fees associated with the foregoing and all other related damages, including, but not limited to, attorney's fees and costs to the maximum extent permitted by law, including, but not limited to, ERISA Section 502(g); and

C.   Awarding such further relief as this Court deems just and appropriate.

Dated: December 8, 2023

DANIELS, FINE, ISRAEL,
SCHONBUCH & LEBOVITS, LLP

By:   */s/Paul R. Fine*

Paul R. Fine
Geronimo Perez
Attorneys for Plaintiffs
CONSTRUCTION LABORERS PENSION
TRUST FOR SOUTHERN CALIFORNIA,
and JON PRECIADO, SERGIO RASCON,
ADRIAN ESPARZA, ALEX ARTIAGA,
MICHAEL DEA, HERTZ RAMIREZ,

DANIELS, FINE, ISRAEL, SCHONBUCH & LEBOVITS, LLP
1801 CENTURY PARK EAST, NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 556-7900
FACSIMILE (310) 556-2807

PETER SANTILLAN, JEROME DI PADOVA, CATHERINE MONCADA, ALAN LUDWIG, JEFF STEWART, LANCE BOYER, BILL BOYD, and JOHN COOPER, as TRUSTEES OF THE CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA, on behalf of the Construction Laborers Pension Plan for Southern California

OF COUNSEL:

SCHULTE ROTH & ZABEL LLP
Ronald E. Richman (Admitted *PHV*)
William H. Gussman, Jr. (Admitted *PHV*)
Andrew B. Lowy (Admitted *PHV*)

919 Third Avenue
New York, NY 10022
Telephone: 212.756.2000

Attorneys for Plaintiffs CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA, and JON PRECIADO, SERGIO RASCON, ADRIAN ESPARZA, ALEX ARTIAGA, MICHAEL DEA, HERTZ RAMIREZ, PETER SANTILLAN, JEROME DI PADOVA, CATHERINE MONCADA, ALAN LUDWIG, JEFF STEWART, LANCE BOYER, BILL BOYD, and JOHN COOPER, as TRUSTEES OF THE CONSTRUCTION LABORERS PENSION TRUST FOR SOUTHERN CALIFORNIA, on behalf of the Construction Laborers Pension Plan for Southern California

42